EVANS, District Judge,
dissenting:
I respectfully dissent. I conclude that a person in Appellant’s position (a non-Cuban immigrant married in 2010 to a Cuban immigrant who had obtained an adjustment to resident alien status in 2000) is not entitled to the benefit of the unique rollback provision in Section 1 of the Cuban Refugee Adjustment Act of 1966 (“CAA”).[1] This rollback provision entitles an applicant for adjustment to permanent resident status to have the adjustment recorded as of a date thirty (30) months prior to the application for adjustment of status. Because a person in permanent resident status must reside in the United States for five (5) years prior to applying for naturalization, 8 U.S.C. § 1427(a), the rollback gives the successful applicant a thirty (30) month head start toward eligibility for naturalization.
The statute on its face demonstrates Appellant Silva-Hernandez does not fall within the class of persons intended to be benefitted. She was not Mr. Hernandez’s spouse when he applied for adjustment of status to permanent resident alien in 2000. She became his spouse in 2010. Section 1 of the CAA provides as follows:
That, notwithstanding the provisions of section 245(c) of the Immigration and Nationality Act, the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959 and has been physically present in the United States for at least one year, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if the alien makes an application for such adjustment, and the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence. Upon approval of such an application for adjustment of status, the Attorney General shall create a record of the alien’s admission for permanent residence as of a date thirty months prior to the filing of such an application or the date of his last arrival into the United States, whichever date is later. The provisions of this Act shall be applicable to the spouse and child of any alien described in this subsection, regardless of their citizenship and place of birth, who are residing with such alien in the United States, except that such spouse or child who has been battered or subjected to extreme cruelty may adjust to permanent resident status under this Act without demonstrating that he or she is residing with the Cuban spouse or parent in the United States.
Pub.L. No. 89-732, § 1, 80 Stat. 1161, 1161 (as amended) (reproduced as a historical note to 8 U.S.C. § 1255) (emphasis added).
I read section 1 as describing a situation in which the Cuban-born spouse is entitled to a record of admission to permanent residence as of a date thirty (30) months prior to the filing of his last application, or the date of his last arrival into the United States, whichever date is later. His spouse[2] is entitled to the same rollback, *366 even though she is not of Cuban birth. The non-Cuban spouse is described in the statute in relation to her husband, the Cuban spouse. This relational aspect of the statute is made clear in the part which says “[t]he provisions of this Act shall be applicable to the spouse ... of any alien described in this subsection .... ”[3] The alien “described in this subsection” is the Cuban-born spouse who is applying for permanent resident status, along with his wife.
In my opinion, the majority opinion ignores these key words in its analysis. The majority concedes the first sentence of section 1 — which describes the qualified native or citizen of Cuba applying for status adjustment — is “unambiguous.” The majority further recognizes that “the alien ‘described in this subsection’ is the one who was unambiguously described in the first sentence.” Where I think the majority’s analysis falters is in its failure to recognize that the first sentence of section 1 describes a Cuban-born alien who is eligible to apply for an adjustment to permanent resident status.
The statute assumes the couple is married and that they are moving through the immigration process together. Mr. Hernandez applied for and received his adjustment of status under the CAA in 2000. He was unmarried at the time of his application and at the time of his adjustment to permanent resident status. By the time Appellant Silva-Hernandez married Mr. Hernandez in 2010 he was already a permanent resident. Therefore, she has never been the spouse of an “alien described in this subsection,” because the “alien described in [section 1],” is an alien who has not yet had his status adjusted. In my opinion, then, she cannot be an intended beneficiary of the CAA. Because Silva-Hernandez did not qualify for the thirty (30) month rollback in the CAA, there was no impediment to the Immigration Service’s granting her adjustment of status to permanent resident alien only back to the date of her marriage to Mr. Hernandez, in accordance with section 23.11(m)(2) of the Immigration Service Adjudicator’s Field Manual.
Moreover, even if the statute is ambiguous, the legislative history of the CAA clearly shows Congress intended the special rollback provision be accorded only to immigrants from Cuba and their spouses at the time of immigration. The legislative history is replete with discussion about the plight of Cuban refugees in the United States in 1966.[4] The overarching purpose of the CAA, repeated often in the legislative history, was to allow Cuban refugees to apply for permanent residency status without having to leave the United States. The law as it stood in 1966 was that aliens from countries in the Western Hemisphere could not apply for adjustment of status from within the United States. Adjustment of Status for Cuban Refugees: Hearings on H.R. 15182, H.R. 15183, H.R. 16908, H.R. 10808 and H.R. 13393 Before Subcomm. No. 1 of the H. Comm, on the Judiciary, 89th Cong. 30 (1966) (statement of Nicholas deB. Katzenbach, Att’y Gen. of the United States). They were required, *367 justified by Congress on the basis of proximity and concerns about fraud, to leave the United States and apply for an immigration visa from a U.S. Consulate in another country. Id. For most immigrants, this meant simply returning to their home country. Id. However, after the United States severed diplomatic relations with Cuba in 1961 and closed its consulate there, this option was not available to Cubans living in the United States. Id. It was possible for Cubans to go to another country, e.g., Canada or Mexico, but the travel was complicated, expensive, and “unreasonably burdensome” on the refugees. 112 Cong. Rec. 28605, 28607 (1966). In addition, the influx of applicants to these nearby consulates was overwhelming those offices, resulting in significant limitations on the types and number of Cuban applications they would accept.
The legislative history further details the significant disadvantages, both to individual Cubans as well as to the United States’ economy, of not permitting Cuban refugees to obtain permanent resident status. These included inability to find sufficient employment, inability to leave the United States to consider resettlement in other countries because re-entry back to the United States was not assured, inability to successfully disperse Cubans throughout the country because of limited employment options, and inability to pursue certain educational opportunities. It is in this context Congress passed the CAA — a narrow law exempting qualifying Cubans from certain immigration rules and permitting them to apply for adjustment of status from within the United States.
This Court has previously acknowledged Congress added the family provision out of concern for “family unity.” Gonzalez v. McNary, 980 F.2d 1418, 1421 (11th Cir.1993). The family provision was added after Deputy Attorney General Ramsey Clark pointed out there were likely a number of cases where a “citizen of Cuba may have married and have his spouse and children living with him in the United States.” H.R.Rep. No. 89-1978, reprinted in 1966 U.S.C.C.A.N. 3792, 3799 (emphasis added). In order to “maintain the unity of the family,” Deputy Attorney General Clark recommended language, which Congress included verbatim, making the spouse and children of a qualified Cuban applicant eligible under the CAA’s adjustment and rollback provisions, even though they might be non-Cuban themselves. Id. (emphasis added).
Both of Deputy Attorney General Clark’s statements suggest a marriage or family already in existence. He used the phrase “may have married.” This is in the past tense; he is concerned about adjustment applicants who are already married or who already have children when they apply. He explains next that some of these family members might not be Cuban themselves and therefore were not eligible for adjustment under the bill as written. In the very next sentence, Deputy Attorney General Clark suggests changes in order to “maintain” the unity of this family. “Maintain” is defined as “to keep in an existing state.” Webster’s New Collegiate Dictionary 687 (1979). Therefore, “maintaining” a family necessarily presupposes it already exists. His specific use of “maintain,” together with the express concern about Cubans who “may have married,” is compelling evidence Congress intended the provisions of the CAA would only apply to a non-Cuban spouse who was already married at the time of the Cuban’s application for adjustment.
Given the extensively documented concerns about the cumbersome and expensive travel requirements imposed by the existing law on Cuban refugees, as well as *368 the administrative burdens associated with processing hundreds of thousands of Cuban refugees, the legislative purpose and history confirms a reading that the family provision was only ever intended to cover the Cuban’s then existing spouse and family. The family provision streamlined the entire family’s immigration application and processing. Rather than requiring the Cuban spouse to apply for and receive permanent status, and then subsequently requiring his spouse and children to apply as the close relative of an alien with permanent residence status, Congress chose to permit his very immediate family to move through the immigration process with him, and under the same adjustment rules as applied to him. This group processing served both to “maintain the unity of the family,” as well as to promote Congress’ expressed desire to relieve the administrative burden caused by the influx of these refugees.
Permitting a later married spouse to apply for adjustment under the CAA — ten years after the Cuban himself has moved through the immigration process and has settled in the United States — furthers neither of these congressional purposes. It is of no additional administrative efficiency to process the non-Cuban spouse’s application for adjustment ten years later under the CAA as opposed to under any other applicable status adjustment provisions. It also strains common sense to argue applying the CAA to Appellant Silva-Hernandez “maintains” any sense of family unity. The family provision was added, word for word, as requested by Deputy Attorney General Clark. His explicit reason for adding the family provision was concern for Cubans who might already be married and have children, and to provide for a mechanism to move the entire, existing, family through one status adjustment process. Applying the provisions of the CAA to Appellant Silva-Hernandez, ten years later, does not serve the clear congressional intent behind the family provision.
Furthermore, other congressional testimony confirms a reading that the future spouse of an unmarried Cuban who has already been adjusted to permanent resident status is not an intended beneficiary of the Act because she is not, and was not ever, the spouse “of any alien described in this subsection.” After the House added the family provision to its version of the bill, Assistant Secretary for Inter-American Affairs, Lincoln Gordon, advocated the Senate also “consider the inclusion of such persons — that is direct family relatives of the persons directly affected by the legislation.” To Adjust the Immigration Status of Cuban Refugees in the U.S.: Hearing on S. 1211 and S. S712 Before the Sub-comm. on Immigration and Naturalization of the Comm, on the Judiciary, 89th Cong. 21 (1966) (emphasis added). The Senate committee report released after the provision was added explained the family provision “amend[ed] section 245(c) [of the 1965 Immigration Act] to make eligible for adjustment of status a native or citizen of Cuba and his spouse and children, who have entered the United States and have not otherwise acquired the status of permanent residence.” S.Rep. No. 89-1675, at 6 (1966) (emphasis added). In neither the statutory text nor the legislative history is the non-Cuban spouse ever identified separately from her Cuban spouse. At all times, the applicability of the CAA to the non-Cuban spouse is in direct relation to the “principal beneficiary” of the law: the Cuban spouse eligible for and applying for adjustment. Although the law clearly envisions a non-Cuban spouse as a beneficiary of the law, she is a derivative beneficiary only to the extent of her relationship with the principal, Cuban, beneficiary. Since the CAA was only applicable to Mr. Hernandez before he received his perma *369 nent residency status, and because Appellant Silva-Hernandez was not his spouse at that time, there is no derivative benefit for her to claim ten years later.
Because the text of the statute unambiguously applies the provisions of the Act only to the spouse of the Cuban refugee “described in [Section 1],” because the Cuban refugee “described in [Section 1]” is unambiguously an alien proceeding through the immigration process, and because it is undisputed Appellant Silva-Hernandez was not Mr. Hernandez’s spouse until after he was already a permanent resident, I conclude she is not entitled to the benefit of the rollback provision. Further, even if the statute were unclear on its face, the legislative history indicates the family provision was added to “maintain” family unity during the immigration process, and never to serve as a mechanism for a later-married spouse to move through her own, independent immigration process. For these reasons, I respectfully dissent.

. Even though the title of the Act suggests application to refugees in 1966, the text of the statute makes clear its provisions continue through today.

. For simplicity of discussion, it is assumed the husband is the Cuban-born spouse, although the statute makes no such distinction.

. I will refer to this as the “family provision.”

. See H.R.Rep. No. 89-1978, reprinted in 1966 U.S.C.C.A.N. 3792; S.Rep. No. 89-1675 (1966); Conf. Rep. No. 89-2334 (1966); 112 Cong. Rec. 27962 (1966); 112 Cong. Rec. 28605 (1966); To Adjust the Immigration Status of Cuban Refugees in the U.S.: Hearing on S.1241 and S. 3712 Before the Subcomm. on Immigration and Naturalization of the Comm, on the Judiciary, 89th Cong. 1-57 (1966); Adjustment of Status for Cuban Refugees: Hearings on H.R. 15182, H.R. 15183, H.R. 16908, H.R. 10808 and H.R. 13393 Before Subcomm. No. 1 of the H. Comm, on the Judiciary, 89th Cong. 1-73 (1966).